Thank you, Your Honor. Tim Beck told on behalf of the Finnigan Estate. I think, Your Honor, one undisputed fact controls that case, and that is that the railroad right-of-way that crosses the Finnigan property is part of a 20-mile segment of a right-of-way that was abandoned in total in 1958. I think that this fact alone provides two ways to grant relief that the requested by the state and put an end once and for all to any possible plan by the government on the estate's land. First, under Section 912, I think the Court can simply confirm the uncontested abandonment of the estate's property and the government's claim. The 1988 Rails-to-Trails Act that the government relies on doesn't preclude that result for several reasons. First, it's because the 1988 Rails-to-Trails Act, Congress spoke prospectively only about abandonments, like I said, commencing from October 4th of 1988, and obviously that doesn't include an abandonment that undisputedly occurred in 1958. It depends on whether abandonment means only physical abandonment or whether it also requires a decree of abandonment, and that seems to me to be a pivotal analytical question for us, and given the earlier legislation and the fact that, in general, adverse possession doesn't lie against the government, so perhaps the reverse is true too, that there has to be some judicial imprimatur on the government for its part, taking advantage of abandonment. Isn't that sort of the first question? What does it mean? It is, Your Honor, and that's why I think that the Court in both the Vista and View took the described abandonment as the actual process of the railroad no longer using the link, and so, and both the Vista and... But that's ineffective, isn't it? I mean, that's the It's sort of like saying that divorce means somebody leaving the marital home and going to live somewhere else. That's a, you know, physical divorce, but it isn't effective legally until there's a judicial decree, and it appears to me that the district court's analysis along those Well, you know, the district court in the King County addressed that and said, you know, this segment of trail had been abandoned, but there's no time limit for the judicial decree, so that in the... So when we look at that situation, where I think this is completely analogous to what we have here, the King County Court said, look, this stretch of rail was abandoned, and, you know, there's no judicial decree, but there's no time limit on it either, so as long as it's been abandoned, then the time limit to getting the judicial decree doesn't matter, and even if that occurs after 1988. So the district court didn't even address the King County Court decision at all, and I think... Let me stop you for a second, and I'm not sure that I of the 1988 act, there was no time limit. It's as if the government, which was the original owner of the land, had given rights to the railroad company, but they weren't feasible rights. In 1922 said, well, if it's abandoned, but not making it simply physical abandonment, adding something that required a decree or declaration by Congress or a court, we'll let the adjoining landowner take the property, and then in 1988 said, well, that's... We're taking a different direction now, and I'm not sure why we should assume that the 1988 act leaves on offer to the adjoining landowner if and when he gets around to it to reach out and claim title to this property. If the landowner hadn't done anything in the preceding 66 years, I'm not sure why the government should be assumed to be leaving that offer on the table, even as it's changed its policy direction. Why do you say the 1988 act didn't pull back whatever offer might have been on the table before? Well, because it, it didn't overrule section 912. It left it standing, and had it intended to overrule 912, it certainly could have invalidated that law, but it didn't. And furthermore, I mean, 912 still had useful life because it still had the one year after decree time for a public highway. So if somebody had done something immediately before the enactment of the 1988 act, federal government wasn't looking to extinguish that. Indeed, the public highway part persisted. So I'm not sure the failure to repeal 912 really answers the question as to why Congress would have intended that offer to remain on the 4th of 1988 for abandonments. And so it's like those, when railroads stopped using their, their grade after 1988, then, then the rails to trails act would apply. But it doesn't say that for those, I mean, it does not address those situations that the court is looking at right now. And, and similarly, when the, this court in Avista saw the situation, it said, well, I'm going to send this back to, or we're going to send this back to the district court and determine whether 912 applies to declarations of abandonment issued after the effective date of the rails and trails act. So that's at Avista 1251 no 12. But so this is a situation that the, that the ninth circuit asked the district court to determine on remand in Avista, but because of the procedural developments later in Avista, the district court never got there. But the, but even so the, even if the court decides that, that, that abandonment, that the abandonment is some sort of unified whole, and is not a two port two point process like the King County court found, then the court can still give this, can grant the Finnegan's their land simply by saying that this was one unified abandonment. And the Bennett court for one has is the judicial determination. And that happened before the 1988 rails to trails act. So that didn't include this parcel, correct? Uh, the, the Bennett decision said for the right away, it didn't, it didn't specify any one particular parcel, but there was a specific parcel at issue. There certainly was. And so what, what the, what we have here, excuse me, how could it be adjudicating more than the parcel that was an issue? Well, I think it, what it adjudicated, it was the, it didn't, it adjudicated the right away that, that had been abandoned. And that's what the, what the Bennett decision said is that it found it adjudicated that this right away is abandoned. So it didn't specify only for that particular parcel. So it was a court of competent jurisdiction over that area. How did the court have jurisdiction over more than the, than the actual parcel that was in front of it? It may, I mean, if let's suppose this was a 300 mile stretch and there was a, you know, one acre parcel, uh, the court could say, well, the entire thing has been abandoned. So this one acre for sure, I'm declaring, you know, it's abandoned, but I don't understand how that stems, uh, to a declaration with respect to parties that aren't before the court. Uh, well, you know, that was a situation that actually came up in the King County case where they said this court only has jurisdiction over our, in this County. And I think the same thing happens here, but this is a situation where it is a small stretch and that court had jurisdiction over the whole stretch of it. So the, I think, how do you say the court had jurisdiction, had jurisdiction theoretically, if there was an action involving another parcel within the County, perhaps, but I look at the, your briefs quotation of the complaint from Bennett and it makes specific reference, uh, said land, said land, said land being the legal description of Bennett's real property. On its face, that action doesn't seem to speak directly to any property other than Mr. Bennett's. I guess then what, what we're asking the court to consider is, is that the, to, it does, it makes sense that, that, that the abandonment would be for one unified whole and that have the unified whole, it, it is, it, it, that's why the Bennett one is one, is the one that precedes the 1988 act. But similarly, there was an adjudication for this parcel specifically in 1996. So what the, when the Finnegate estate, and I think that what the government argues as well, the government wasn't a party to that. It wasn't, and it wasn't notified, but regardless, there was a court of adequate jurisdiction who adjudicated this abandonment and said in 1996, that it applied. Well, can we apply the effect of that court determination to a party that should have been included, but was not included in that determination? I mean, by 96, it's after the enactment of the 88 act and the 88 act makes a point of saying lands within the national forest, which is apparently is passed to the national forest. So it seems pretty clear by 1996, the U S government is an interested party, but it's not named given notice or given an opportunity to speak. So I'm not sure how that court determination can count for anything. Well, you know, your honor is as the, the magistrate judge noted in this case at the time, the state of the law at that time under view was, was, was that the, what the, what the court, what the judge judge and lawyers didn't in the case in the Finnegate estate was adequate at the time. And of course, I mean, view says requires a two-step process. Physical abandonment isn't the end of the story. So I'm not sure I follow how you supports the proposition. The United States wasn't an interesting party. Well, the, the, it, the parties that, that were aware that the, that the County was aware of and that the railroads were aware of did not include the United States at the time. It really doesn't speak to the problem though, which is okay. They were well-intended. I'm not saying they were malicious about it, but if the United States wasn't a party to the proceeding, I'm not sure how we can say today that counts as an adjudication that ought to extinguish the interest of the United States. I mean, give me a logical reason why it should, but your honor in, in either, in either situation, there's, there's no way that they could have had the, they couldn't have had the abandonment confirmed without the abandonment of the entire 20 mile segment being confirmed. And your honor, at this time, I'd like to say the rest of my time for rebuttal. You certainly may do that. And we will now hear from Mr. Smith. Thank you, your honor. Good morning. AUSA Mark Smith on behalf of the Forest Service. Your honors, the district court properly granted the United States summary judgment in this case. And this court should affirm as judge Clifton was suggesting in his comments, the history matters here and, and having a sense of the sequence of things that, that unfolded here is important because it helps us to understand exactly what Congress was up to with these, the acts that we're talking about, the statutes that we're talking about. In 1864, they granted this right of way to Northern Pacific. And according to the Townsend case in 1903, the Supreme court said that was a limited fee with the right of river going to the United States. So as long as that right of way was being used for railroad purposes, it was Northern Pacific to use. When railroad purposes stopped, it went back to the United States. I just, uh, could ask you a question about that. Did it go back automatically to the United States when the railroad stopped using it or did there have to be a decree? So your honor, I would say that that depends on which authorities you're consulting. The, the 1864 act itself and the Townsend case suggest that mere cessation of use as a railroad reverts the right of way to the United States. Are you saying that Townsend is overruled? So, there's no longer an automatic reverter? No, ma'am. Um, I think it's a question of is Townsend still good law? Yes, ma'am. Okay. So at the point of non-use, it automatically reverts, the property automatically reverts to the government. That's what the, the original granting language indicates. And that's what the Townsend court stated. Yes. Thank you. Um, yep. Uh, you're welcome your honor. So in 1922, Congress passes the Abandoned Railroad Act in section 912. And this allows adjoining landowners to acquire the United States reversionary interest. If they just go into court and get the decree confirming the railroad's physical abandonment. Oh, excuse me. At that point, the, uh, the property belongs to the government because the railway has stopped using it. And then there's an automatic reverter to the government. And then the estate, the landowner can go in and ask for a decree. Is that correct? Yeah, the, so the language in 912, the plain language there states that, that, that the, the reversion can go from the United States to the landowner. So at some point, it goes from the railroad to the United States. So under Townsend, I guess the land would be taken by the railroad. And then if there's a decree, it's transferred to the, uh, to the property owner, correct? Yes, ma'am. That's correct. Thank you. So in this case, uh, there was the railroad pulled up its tracks at some point in the 1950s or the 1960s and Glaudina Finnegan and her predecessors had an opportunity from that point until 1988 to go into court and get judicial confirmation. They slept on their rights. They never actually went in there and got that decree. In 1988, Congress enacts the Trails Act, and they do this because they realize the mileage of railroad rights of way available is rapidly diminishing. And they understand now that this is an important asset in terms of recreational opportunities and in terms of possibly reactivating these rail lines in the future. So at that point, they changed the dynamic. The reverter goes state with the United States, right? So at the point of physical abandonment, it reverts to the United States, and then it remains in the United States. But the reverter to the United States happens at the point of physical abandonment. Is that correct? I believe that's, that's the, the interpretation that flows from Townsend and from the 1864 Act, Your Honor. Yes. So then what is it, your argument then would be, so we said in Avista that under 1248 C, the railroad rights of way abandoned after October 4th, 1988, reverted to the United States. That was our holding on Avista. So, so the reversion to the United States happens at the point of physical abandonment. So, so you need us to reinterpret that to mean they don't revert to the United States. They've already reverted to the United States, but then it remains in the United States. Is that, is that your argument? I think so, Your Honor. So, so section 1248 says shall remain. Our interpretation in Avista was incorrect. Our statement about in Avista was incorrect. I'm sorry, which, which statement in Avista are we referring to now, Your Honor? Under 1248 C, railroad rights of way abandoned after October 4th, reverted to the United States. But you can't accept, you wouldn't be able to accept that because they obviously reverted to the United States at the point of physical abandonment. So, so you would have to disagree with that, with that statement. I would interpret that statement as meaning contrary to the effect of section 912, right? The reversionary interest reverts to the United States. At the point of physical abandonment, I think we already agreed that that's what Townsend said. Yeah, but, but so we're amending, we are amending section 912 in terms of where the reversionary interest goes, right? So it's affecting an alteration in the operation of that statute. Well, I thought just that it reverts, the reversionary interest goes immediately to the United States. And then under 912, it's transferred to the landowner if there's a decree. In 1248, it just stays with the United States, correct? Right, right. And so it's, it's basically envisaging a couple of different scenarios here. One where the landowner goes in and confirms abandonment and one where they do not. So there's definitely some, some difficulty in terms of the, of the semantics involved here. Yeah, because they're contrary to that language. I also had a question in 1248 C, where the public highway exception, they refer to a determination of abandonment. So if abandonment means abandon plus a decree, why isn't that redundant? I know you tried to explain it in your brief, but I didn't quite understand the explanation. Could you go through that? In terms of the, the highway exception as stated in, in 1248 or as stated in 912, your honor? Well, well, we're constrained what 1248 C requires. And so we have to figure out what the word abandonment means. And you argue in your brief, it means if there's a decree, abandonment means abandonment plus it's been decreed. But then later on, Congress refers specifically to a determination of abandonment. So if abandonment means abandonment plus a decree, physical abandonment plus a decree, then you would have determination of a physical abandonment plus a decree. So it would be redundant. So I didn't understand your explanation in the brief as to why Congress would say determination of abandonment and abandonment to mean the same thing in, in just a very short statutory section. So the section 1248 C sits on top of section 912 here, right? It's, it's amending those terms. So you have to. It's not amending, right? It's, it's, it refers to a cross-references 912. And then it sets a new, it doesn't overrule 912. So it's, it's hard to say it amends 912. But it generally cross-references 912. Yeah. I'm relying on the, on the court's verbiage in, in cases like SC Johnson, you know, where they, where they basically said section 1248 C is an amendment of the reversionary interest in 912. It's, it's taking. It's not, it's not way correct. It's not actually an amendment, is it? I don't know if it's denominated as such your honor. Yeah. I mean, by, by explicit reference to that statutory section in the terms of 1248 C it's amending where the reversionary interest goes. So I think there can be little question about the effect of 1248 C you know, in terms of the fact that it states a determination of abandonment or forfeiture. I don't think that's necessarily redundant to the term upon the abandonment. It's just reinforcing the same concept. What's it? How can that be though? If abandonment already includes the concept of a decree, you wouldn't need a determination of a decree, right? Well, the, the, I think that's correct. The short answer to your question is yes. I think probably it's helps to refute plaintiff's position. And in this case that they use that term twice in here your honor to the contrary of plaintiff's interpretation that Congress had this intent to convert what was universally understood in section 912 to be a two part definition into a one part definition. It makes more sense here that when they say determination and when they say abandonment, it's they're using the same principle as articulated in section 912, 912, which is physical abandonment. Excuse me. There seems to be another way to look at it as well, which is that it sort of confirms your original statement that the United States has a reversionary interest the moment there's a physical abandonment. So that if you read them as being two distinct things, the first half of that sentence in subsection C means that the United States has and retains the title to the property as soon as it is physically abandoned, unless there is this judicial determination which in the earlier act meant a neighbor and now means something different. So I'm not sure why that isn't the best reading of that sentence. I may be wrong about that, but I appreciate you're looking at it and telling me what your thought is on that. I think that is the appropriate interpretation, Your Honor. And I state that based upon the fact that it's most consistent with the purpose that Congress had in enacting the Trails Act here. So when does the abandonment have to take place? I mean, the language says commencing October 4th, 1988 upon the abandonment. So does the abandonment have to take place after 1988 or before 1988? Given the way that courts were defining abandonment in section 912, abandonment has to include confirmation. So if a confirmation occurs after 1988. So just looking at 1248C, it says commencing October 4th, 1988 upon the abandonment. So what is in the United States? So the abandonment doesn't happen until after the decree, and then what does the United States hold before that time? Nothing? Does it stay in the railroad? So the title remains in the United States. As I said, you know, section 1248 sunsetted the provision in 912 that allowed for the reversionary interest to be reallocated to the neighboring landowner. And so, you know, this is consistent with the congressional intent. If you look at the Pre-Salt case. Excuse me, it seems to me again you're making this more complicated than it needs to be. The law was that upon physical abandonment, title revested in the United States. And what this says is it remains with the United States. It doesn't say it starts up again. It just says it remains there unless this new procedure is followed after 1988. It just, I don't know, it seems like there's, that it's being made more complicated than it needs to be. And I may be oversimplifying it. No, I agree with your interpretation, Your Honor. I do, 100 percent. You're willing to take that suggestion. Yeah, I mean either there's two types of abandonment or there isn't. Either there's an abandonment when there's a physical abandonment and it goes to the United States, or there's abandonment only when there's a decree, in which case it goes to the property owner. And the question we're looking at in 1248C is, does, what sort of abandonment are we talking about and does it have to happen? So if it's physical abandonment, then 1248C only applies if the physical abandonment happens after October 1988. If it's the sort of abandonment that you have with the decree, then what does the United States have during those 66 years? Apparently nothing. Or we have to say, well, Congress didn't know what it was talking about and use the word in two very different ways. So I'm a little confused about how we're supposed to interpret 1248C consistently with Townsend. Well, I think if there's a decree between 1922 and 1988, then it goes to the adjoining landowner. Sorry about that, my computer just went to sleep. If, however, 1988 comes and goes, and they have not secured judicial confirmation, then there is no possibility for the adjoining landowner to obtain the reversionary interest. Oh, it's nice if Congress had put that into the statute, but I understand your position. Thank you, counsel. Is my time expired? I'm sorry, I don't have a clock in front of me. Your time has expired. All right, thank you, Your Honor. I think we understand your position. Mr. Bechtold, you have a bit of rebuttal time remaining. Your Honor, first of all, I'd like to take the opportunity to address Judge Clifton's question about the meaning of Bennett here. So I think that, you know, what 1988 says is the federal interest in the right-of-way become the property of any adjacent landowner whose own title is based on the federal conveyance through which the right-of-way pass. That's from that Senate report. But a VISTA treats abandonment and confirmation as two separate items. So they treat abandonment as end of use and confirmation as the process used to require a vest transfer to the private owner's interest. So 948 doesn't sit on top of 912, they sit side by side. Both contain the public highway exception. So it's not like 1248 needed 912 to keep the public highway exception. They both contain it. So since this court has treated the abandonment as essentially a two-step process in a VISTA, and the thing about a VISTA is that there was basically all parties agreed that there had been no prior judicial determination. And so it wasn't even before them. And that's why on remand, VISTA said, you know, figure out what's going on here with, you know, when there's a confirmation. To say that it's not a two-part process is basically to say that what the district court in the western Washington district was simply incorrect when they decided the King County case. Well, that may be. We're not bound by that opinion. We may disagree with it, correct? You may. And similarly, the Seventh Circuit disagreed with this circuit in a VISTA. So obviously not all judges agree. But I think in this case, as a practical matter, what we have is one 20-mile section of abandoned railroad of which about probably four and a half are now and have ever needed to be judicially determined because the And this is the last pit. This is the last end before it goes underwater. This small piece of property where these unsophisticated people thought they had dealt with this in 1996, and they hired a lawyer who took care of it for them. They had no idea. And then when the poor woman died and her estate's getting probated, suddenly there's this issue of the United States saying, well, we want this land now. These poor unsophisticated people are being taken advantage of by the government in this Johnny-come-lately thing where they, for every prior quiet title action in this one, had said, we don't want that land. So it's a small bit of land that can be used for nothing else except basically these people's home. And it simply is a simple matter of fairness. It makes no sense at all for the government to simply claim it now. Thank you, Your comment impels me to ask, what is this land being used for? I looked at your overhead photograph. I really couldn't tell. So what's at issue here, really? It's their home. It's where they live. It's a small parcel next to the reservoir where their houses are. Is their house in the right-of-way? No, the house is not in the right-of-way. So if you look at the opening brief, there's a blow-up picture of where it is. You could argue that part of their houses is in the right-of-way, but for the most part, their houses are back enough far away from the right-of-way. They're not included in it. That's why your comment confused me. I looked at this overhead photograph. It's their property. They use it for anything that a normal person would use their rural property for. They have some garden items there. They use it to access the rest of their land. They manage it as if it was theirs. Why do you access the rest of their land? Because as I look at this, the right-of-way is on the side. The government is now saying it's part of the National Forest. I don't see anything that's their land on the other side of the right-of-way. That's river. I see what you mean. What you're saying is that the land that is on the north side of the road is separate from what you would consider their property. What's that being used for? It looks like that's the riverbank. Right. It is the riverbank. They have been managing that property as if it's been theirs for the last hundred years, basically. Thank you, counsel. The case just argued is submitted. We're very appreciative of the interesting arguments from both of you on this difficult case. With that, this case is submitted and we're adjourned for this morning's session. Thank you, your honor. Thank you, your honor. This court for this session stands adjourned. Thank you.
judges: Graber, Clifton, Ikuta